May it please the Court, Joseph Seguenza for Petitioner. This Immigration Appeal this morning presents two issues for the Court's consideration. The first issue is whether the Board of Immigration Appeals abused its discretion in denying a timely filed motion to reopen to seek adjustment of status on a marriage-based petition. And the second issue is whether the Immigration Appeal's incidence with native Fijians in her home country of Fiji did not rise to the level of persecution and did not constitute a well-founded fear of persecution. And if I may address the motion to reopen first. Counsel, could I ask a preliminary question? The papers indicated that the husband was going for a naturalization interview. Can you tell us what the status currently is? Yes, Your Honor. In fact, he was interviewed in March of last year at about the time that the briefs were due. And he, in fact, naturalized in May of last year. And I was speaking with government counsel outside off the record. And apparently, there has been an interview scheduled on the I-130 petition, the marriage-based petition. What makes this case so compelling in light of the Velarde Board decision governing motions to reopen in these situations is that we have a marriage-based petition that was filed by a permanent resident spouse husband back in 2002. And unfortunately, the petition languished or fell through the cracks. As I indicated to the Court, he has since naturalized. And he, in fact, naturalized last year. What that means for the petitioner is that a visa, it becomes immediately available through that route rather than through petition as an LPR spouse. I believe at the time that the Board denied the motion to reopen, they had found that at least four of the five elements of the Velarde analysis were met by the petitioner in this case. It was timely filed. It was not numerically barred. And they also found that the motion presented clear and convincing evidence indicating a strong likelihood that the marriage was bona fide, which I submit is a key element of the Velarde analysis. And we submit also that the motion is not barred by matter of char, rather, or on any other procedural grounds. And the service did not oppose the motion at that time. And I believe that's what is critical here also, Your Honor. We have a lady who But didn't at the time that the Board acted, she didn't have a visa immediately available. That's correct, Your Honor. It would not have been. Wasn't that the procedural problem? Yes. And that's the only reason why the Board denied the motion at that time. Right. But if I may submit, Your Honor, she was so close. Well, I understand. But is that, can we find that they abused their discretion under those circumstances? I would submit that in the exercise of discretion, the Board could have remanded back to the immigration judge. And if it was within the power of the IJ, possibly administratively close the file if the government had joined in a motion to do so. And that way, kind of suspend the proceedings until the husband naturalized, which he did last year. And then the visa would become immediately available. Otherwise, we have a situation where this three or four years, which I know in the immigration system may be not considered a long amount of time. But what we're trying to do here, what we're trying to do for the petitioner is try to avoid having her removed from the United States and having a consular process from out of the country. And we would submit that based on family unity, which this court has upheld in principle numerous times in immigration cases, that the Board, in its discretion, we would submit could have done the right thing by sending it back to the IJ. You mentioned that you had, and I don't want you to get into off-the-record or confidential communications, but have there been any efforts to unofficially mediate this? In other words, to try and come to some resolution with the DHS? There have been. And unfortunately, despite our repeated attempts dating back to last year, middle of last year, and just until most recently, DHS unfortunately has not agreed to sign off on a motion to remand. There were numerous attempts to ask DHS to remand this case. And that would have taken care of the whole thing and made the whole matter moot. But unfortunately, as of yesterday, we had not heard from DHS in that regard. It's still under consideration. They've not refused? No, they haven't refused, but they haven't acted on it either. So on that basis, we would submit that a motion, the motion to reopen should have been granted by the Board, remand back to the IJ for appropriate consideration. I think we have that. Why don't you move on to what you want to say about the merits? Certainly. We would submit that the IJ's findings that the incidents involving Petitioner and Native Fijians in her home country of Fiji, that the IJ's findings were not supported by substantial evidence. He did find that the Petitioner was credible. She testified credibly. But he found that the incidents described by Petitioner at her regular hearings, some four or five incidents, some involving Native Fijians, Petitioner is East Indian from Fiji, and the Court is aware of the long history of racial strife involving Native Fijians and Native Fijians. Guffor, our opinion in Guffor, goes into that in some detail. Yes, and the history of at least two coups, one in 1987 and one in 2000. So if you view the Petitioner's incidents in light of the long history of racial strife, and not just consider current country conditions, it would seem to compel the finding that this lady has in fact suffered persecution, and in fact also has a well-founded fear of persecution if she had returned to Fiji. She in fact testified at the hearing that she fears returning to Fiji because of the Natives, and because she's Indian, and because she's a woman. What do we make of the IJ's somewhat passing reference, but he did refer to the fact that after the telephone call threatening the daughter, not named apparently, with rape, the father sent the Petitioner out of the country, but not her younger sister, who I think was around 19 at the time. And apparently for all the record shows, she and the family, she's still there with her family. What does one make of that? Well, Your Honor, I'm aware of that reference by the IJ in his decision. I would submit that I believe the circuit has held that family members who remain in Fiji, the fact that they may not have suffered persecution similar to Petitioner, is not the relevant consideration here because they've been there. What I meant was, that I understand, but the IJ said that it was an anonymous threat and nothing's happened, and indeed he noted that the daughter did remain, that whatever the substance of the threat was, it wasn't enough to rise to the level of persecution in his view because it was sort of an anonymous, unfulfilled threat. Well, Your Honor, I believe the circuit has also held that threats alone without physical violence can constitute persecution. It's of interest to note that she testified that when this caller had spoken with her dad on the telephone, that I believe the quote was, we will kill and rape your daughter, without specific references to which daughter. There were two daughters in the family, including Petitioner. We would submit that the fact that the family remains behind but has not, fortunately, suffered persecution, as Petitioner did, is not the central analysis here. If they had suffered persecution, sure, that would be part of the consideration of whether there's a well-founded fear of persecution. I would ask the Court to remand, if the Court finds that there is past persecution, remand for consideration of well-founded fear. What was the evidence that the government didn't do anything to prevent criminal attacks on the Indo-Fijians? Yes, Your Honor. I believe that was addressed by the Petitioner. She said that at least on two or three of the five claimed incidents that reports were made to the police, but there was police inaction. And I believe she testified that at least in one of those incidents, she believed that police inaction, there was police inaction because she was, quote, Indo-Fijian. So we do have a situation here, as this circuit has recognized, that if we have incidents of persecution or incidents that rise to the level of persecution by forces, by the government or forces that the government is unwilling or unable to control, that that would satisfy analysis in finding past persecution. Was the country report in evidence? I don't believe it was. I'm not sure, Your Honor. But I know that there was no individualized assessment done on the well-founded fear issue, as this Court has required. And I'll submit. Good morning, Your Honors. I'm Carol Federighi. I represent Respondent Alberto Gonzalez in this matter. I'll address the second petition for review, which is Petitioner's Motion to Reopen First. At the time, as the Court has noted, at the time that the Board considered Ms. Sharma's motion to reopen, her husband was a lawful permanent resident, not yet a citizen. So if the visa petition... But he is now. He is now. And so what's your expectation of what's going to happen to her I-30 petition? Well, there has been an interview scheduled on the I-130 petition for April 14. And I don't know what the outcome of that... I don't want to speculate what the outcome of that would be. If it's denied, that's the end of the matter. But if it's granted? If it's granted, then the next step would be for her to ask DHS to join in a motion to reopen her proceedings. She cannot... She's too late to move on her own for a motion to joint motion to reopen with DHS. So she would try and get DHS's consent to a motion to reopen. I can't, at this point, it's really up to DHS to determine... Well, they're your client. Have you engaged in any discussions with them to see if there's a way to resolve this amicably without inviting precedent from the Ninth Circuit? Well, it's something that they're not willing to consider until the I-130 is approved. And then they look at whether she is eligible for adjustment, and then all the discretionary factors that they would consider at that time. So you're saying mediation would be useless in this case? Yeah, I don't think mediation would be appropriate. At most, I would suggest the court, if it wants to, could defer deciding the case for 60 or 90 days to allow the I-130 petition to be decided and to give her time to seek DHS's consent to a motion to reopen. And then at that point, we would have more information about what's going to happen with that part of the case. But that would be the most I would think would be appropriate at this stage. I don't know if the court wants me to address the motion to reopen the previous... No, why don't you go on to the merits? I can go on to the merits of the case. The standard review here is whether the evidence compels the conclusion that Ms. Sharma had suffered past persecution or has a well-founded fear of future persecution. If we look at the evidence, we see there's no basis to conclude that it compels such a conclusion. The immigration judge found that she had failed to establish past persecution for three reasons. First, that the incidents that she had suffered were not severe enough to rise to the level of past persecution, and the judge looked at those both individually and then collectively. The judge also found that there was insufficient evidence that the incidents that occurred to her were on account of her ethnicity. And the third basis was there was no... The immigration judge found there was insufficient evidence that the government was involved in the incidents or that the government was unwilling or unable to control the perpetrators of the incident. There seems to be a history of the government just standing by. Is that not accurate? I think that the cases where it found that the government was either involved or not acting on persecution of Indo-Fijians had to do with events that occurred in 1987 during the ethnic unrest in that period of time. Her incidents occurred... Well, she had the one incident, the one occasion of stoning in 1987, and then nothing happened to them for 13 years until 2000. And those incidents are in a totally different sort of framework and context than the 1987 incidents. In this case, the evidence showed that she went and reported the incidents to the police, and the police said that they were investigating the incidents. And let me just find the page number. That's the 219 to 220 of the administrative record. She said the police said they were investigating. The case... This case can therefore be distinguished from Sarita, where the police told the alien that they could do nothing. But is there any evidence that they did investigate? No, there's no evidence either that they did or they didn't, other than they said they were. The incidents were just two muggings, basically. Brief incidents where she was overcome and her wallet was taken or her groceries were taken. As you know, even in the U.S., the police don't put those on the highest priority, and they were difficult to solve. She didn't know who her attackers were. The case, therefore, can be distinguished from the same case where the alien gave the police names of his attackers. He knew who they were, and yet nothing happened. So that was evidence that the police were doing nothing because they knew who to go after, and they didn't. In this case, she didn't know who her attackers were, so there's no reason to expect the police to have been able to solve such a... I hate to call it routine, but... Were there any country condition reports and evidence? Yes. On page 275 of the administrative record, there's a... That does refer... You said the conditions had changed, but doesn't that say that there's still ethnic discrimination and violence? Yes, there's still... And she was found credible. So why doesn't her story, essentially unrefuted, indicate that she was subjected to what amounted to a pervasive and escalating degree of persecution? It goes from what you call simple muggings, but she said that this happened five to six times per year to her members of her family, and then her father gets this threatening phone call, threatening murder and rape. So what's the benign aspect of all of this? Well, first of all, the country conditions report does say that conditions have improved, though there's still ethnic strife and violence in... There's a phrase that some people use called, well, zero is the standard, .1 is an improvement. That's true. But in this case, the two incidents that she relied on are the two muggings in 2000. She did mention incidents that occurred earlier on when she was walking to school as a youngster where kids would come up and push her and take her bag. Right, but the precipitating event was the threatening phone call. Threats, yeah. Yeah, and that wasn't just some simple mugging. That was a threat of murder and rape. It was. There was one threat, and I want to distinguish this case then from the Singh case at 94 F 3rd, 1353, where the alien experienced persistent death threats, multiple death threats, and then there were attempts to actually carry out the death threats. In this case, they got one threatening phone call. They threatened the father and an unnamed daughter. Petitioner left. Miss Sharma left the country, but her sister, two of her sisters actually remained in the country and her father, and nothing has happened to them since then. So this is merely an incident of an unfulfilled threat that went nowhere and is not sufficient to compel the finding that there's a well-founded fear of future persecution. And the persecution has to be something that's individually targeted at the petitioner, and there's no evidence here to compel the finding that she was individually singled out for persecution. Let me take the other side of that. You said that they didn't name which daughter. The daughter who did leave, I thought it was she, and nothing's been carried out against the remaining daughters. Ergo, it was individualized against her. She left. So the threat succeeded and she left the country. Well, they also threatened her father, said, you have to leave the land or we're going to do things to you. And the father, as far as we know, they remain in the residence and nothing's happened to the father either. If you got a phone call that said that we're going to murder your daughter and rape her, would it take more than one phone call to make you feel that you've been persecuted or singled out? Again, the daughter, because the daughter- I'm not trying to be facetious. That's a pretty scary phone call. Yeah, it certainly is scary. But whether they're targeting, again, it's whether it's persecution under the act, not whether it's a scary incident of criminal or other mischief. In this case, though they threatened the family, they didn't indicate that it was on account of ethnicity, which is one of the requirements in the act. Well, she testified that she recognized the voice, her father recognized the voice as a native Fijian because of the language dialect. And there was a history and pattern of harassment, we'll call it harassment. And we know from our opinion in Gafur, which goes through the whole history of the uncomfortable relationship, that this is a indigenous problem to Fiji of ethnic violence and discrimination, which the country report says still exists. And the IJ found her credible. So what's missing? Well, I think what's missing is more to go with the threat like evidence that they were going to carry out the substance of the threats or additional threats or continuing threats. And there's no evidence of that here. So the court has held that just a mere threat without evidence of more is not sufficient to compel a finding of persecution or a well-founded fear of persecution in this case. And I think if the family really thought that, I know my time is up, but if they thought it was a real threat, they would have sent their other daughter away and they did not. The only reason was they said she was not, she was under 21 at the time. So if there are no further questions, I'll snip the case. All right. We thank counsel for their argument. The case argued is submitted.
judges: Goodwin, B. Fletcher, Fisher